UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Pierce Division)

Case Number:

CURTIS BROWN,

> Plaintiff,

vs.

BRIDGESTONE RETAIL
OPERATIONS, LLC, a Delaware
limited liability company, d/b/a
TIRES PLUS; DAVID PERRY,
individually, and DAVID TUMA,
individually,

> Defendants.

_____/

### Count I:  Claim Under 42 U.S.C. § 1981 for
### Tangible Job Detriment Race Discrimination

Plaintiff, Curtis Brown, sues Defendant, Bridgestone Retail Operations,

LLC, a Delaware limited liability company, d/b/a Tires Plus; David Perry,

individually, and David Tuma, individually, and alleges:

### Introduction and Summary

1.     This is an action brought by Curtis Brown, an African-American

automobile mechanic, against Tires Plus, a Central Florida district manager,

and the manager of its Stuart store because the management and

employees of the chain's Port St. Lucie and Stuart stores harassed him



**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL  33301 ● 954.462.1983

during the time that he worked at those stores based on his being, **One**, black and, **Two**, married to a white woman.  Tires Plus, acting through Messrs. Perry and Tuma, eventually fired Mr. Brown after — and because — he continued to complain about the harassment and assorted tangible job detriments that were inflicted on him.  He sues pursuant to 42 U.S.C. § 1981 for tangible-job-benefit discrimination, hostil-environment discrimination and retaliation, seeking injunctive relief, damages, including punitive damages, and his costs and litigation expenses.

### Jurisdiction and Venue

2.     This case arises under 42 U.S.C. 1981, the Reconstruction-era statute outlawing racial discrimination in the making and enforcement of contracts.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

3.     The claim being sued upon arose in Martin and St. Lucie Counties, Florida, which makes the Fort Pierce Division of the Southern District of Florida the appropriate venue.

### Parties

4.     Plaintiff Curtis Brown is an automobile mechanic who during the time that he worked at Tires Plus held a certification in his craft by the Institute for Automotive Service Excellence ("ASE").  He is also an African-American male who is married to a white woman and who is the father of a mixed-race child.

5.      Defendant, Bridgestone Retail Operations, LLC ("Tires Plus"), is a Delaware limited liability company, the managers of which are citizens of Tennessee.  The management of Tires Plus was at all times material aware, or should have been aware, of the behavior of its management employees, David Perry and David Tuma, towards Mr. Brown, and either ratified that behavior or was recklessly indifferent to it.  Alternatively, it at all times material delegated to Messrs. Perry and Tuma the authority to make, or threaten to make, decisions affecting the employment status of Mr. Brown concerning Mr. Brown's right to make and enforce contracts.

6.      David Perry was at all times material the white Tires Plus district manager whose area included stores in both St. Lucie and Martin Counties. Mr. Perry at all times material was a supervisor who exercised the authority actually delegated to him by his employer by making or threatening to make decisions affecting the employment status of Mr. Brown, and who used the authority vested in him by Tires Plus to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts.

7.      David Tuma was at all times material the white Tires Plus store manager in Stuart.  Mr. Tuma at all times material was a supervisor who exercised the authority actually delegated to him by his employer by making or threatening to make decisions affecting the employment status of Mr. Brown, and who used the authority vested in him by Tires Plus to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts.

**General Allegations**

8.      Tires Plus, a chain of automotive repair shops and tire stores, employed Mr. Brown as a automotive technician at its Port St. Lucie and Stuart stores from 2014 until May 26, 2016 when he was fired from the Stuart store immediately after his last in a years-long string of complaints about race discrimination.

9.      Throughout the 2014-2016 period, Mr. Brown suffered continuing incidents of racial discrimination, involving both tangible job detriments and serious or pervasive incidents of racial harassment, continuing up to his last day on the job.

10.     Tires Plus's anti-discrimination policy was haphazard and recklessly indifferent to whether its black employee's federal rights against employment discrimination were being violated:

        a.      Tires Plus demonstrated an awareness that racial discrimination was illegal by publishing a written policy against employment discrimination, a copy of which Mr. Brown recalls signing when he was hired, and again when he was rehired, and announcing an "800" number for employees to call.

        b.      Tires Plus, however, provided Mr. Brown no training about what to do in the event he encountered discrimination.

c.      Additionally, the prescribed reporting mechanism was a military-like chain of command, the effect of which was to keep complaints of employment discrimination bottled-up at the corporation's lowest levels: a mechanic was supposed to report any incidents of discrimination to his service manager, who would bring the matter to the attention of the store manager, who would bring it to the attention, if necessary, of the district manager.

d.      Mr. Brown's understanding of the 800 number was that if an employee called it, the problem would be referred back to local management.

e.      The result of this ineffective system was that a pattern of racial discrimination was permitted to flourish throughout Mr. Perry's district.

11.    Mr. Brown had previously worked at two stores in Port St. Lucie from 1998 to 2000 as a tire changer.  He initially worked at the store in western Port St. Lucie.  When the white tire changer, Mark Smedberg, stole four tires in 1999, Mr. Perry sent loss-prevention investigators to Mr. Brown's house to check the tires on the car in Mr. Brown's driveway.  Mr. Smedberg was never investigated, but rather was promoted to manager.

12.    Mr. Brown was transferred to a newly acquired store in late 1999 or early 2000.  The reason given to Mr. Brown for the transfer was that the clientele in the store in east Port St. Lucie was more heavily black and would be easier for Mr. Brown to work with than the primarily white clientele in

western Port St. Lucie.  When he was transferred, his seniority, hourly wage and commission rate reverted to that of a new employee.

13.    Mr. Perry, the district manager, had told Mr. Brown in November 1998 — when Mr. Brown was seeking to become an inside tire salesman, in which role he could have put to use the retail experience that he had gained working as an assistant manager at Winn-Dixie — "You will never succeed in this company as long as I am here"; two weeks later, Mr. Brown put in his two-weeks notice.

14.    Mr. Brown returned in 2014 as an ASE-certified automotive repair technician, having been hired by the store manager in eastern Port St. Lucie, without the knowledge of Mr. Perry.  Mr. Perry did not recognize Mr. Brown until Mr. Brown asked during an orientation session if he remembered him, reminded Mr. Perry of his 1998 remark as he held on to Mr. Perry's hand during an elongated handshake, and told Mr. Perry how that remark had inspired Mr. Brown to work harder to succeed.  Mr. Perry's reaction was, "Well, good for you, welcome back, Curtis."

15.    The first overtly racially discriminatory incidents at the Port St. Lucie store occurred in late 2014:

        a.    Richard Bolz, a newly-hired white co-employee, upon first meeting Mr. Brown, asked if Mr. Brown wanted to hear a joke, and before Mr. Brown could cut him off, told Mr. Brown —  within earshot of Greg Elder, the then store manager — that "down South" watermelons were referred to as "nigger pickles," continuing, "I don't know what it is with you black people

and watermelons; it's just a fruit.  And that's why we call them 'nigger pickles' cause y'all like them more than us."

      b.    Mr. Elder laughed out loud — even though such language is supposed to be grounds for employee discipline.

      c.    When Mr. Brown walked over to Mr. Elder and asked, "Why can he just walk up and say that and you just laugh," Mr. Elder responded, "What the hell do you expect?  He was raised in the mountains.  He's probably never seen a black person before."

      d.    Mr. Bolz later that day locked his tool box as he was leaving for lunch, explaining when Mr. Brown asked him if he were going home for the day:  "No, I'm locking my box because I was told to never trust a nigger.  You seem like a cool black person but you're still a nigger and my daddy told me to never trust y'all."

      e.    When Mr. Bolz said it was "nothing personal," reached out to Mr. Brown to shake hands, Mr. Brown held Bolz's hand firmly and explained sternly that:

      i.    He had a suspicion that Mr. Bolz, who was substantially larger than Mr. Brown, had been hired to provoke Mr. Brown into an at-work fight, so that Tires Plus could fire him;

      ii.    Mr. Brown had no intention of getting into a fight during working hours, but

      iii.    Mr. Brown would not tolerate such racial slurs and, if they continued, he would see Mr. Bolz "after hours."

f.      When Mr. Brown renewed his complaint following the second incident, Mr. Elder responded:  "I got to get back to work.  I have shit to do."

g.      Mr. Bolz not only ceased the racist behavior, but acknowledged to Mr. Brown that the racial taunting had been suggested to him by management.

16.      Subsequent to the incident with Mr. Bolz, Ray Solomon, a black inside-salesman at the Stuart store — the only black person that Mr. Brown ever observed in a customer-facing, inside-sales role during either stint at Tires Plus — was transferred to the Port St. Lucie store as a temporary service manager:

a.      Mr. Solomon was given no training in management of the car-repair function of a Tires Plus store, for which his sales background had not prepared him;

b.      Mr. Solomon was given no authority to settle customer complaints, which led to a number of customers escalating their complaints to corporate headquarters, and

c.      Several months later, Mr. Perry called Mr. Solomon outside to where Mr. Perry's pick-up was parked and, sitting on the opened tailgate of the truck, told Mr. Solomon that he was fired — as both Mr. Brown and a uniformed St. Lucie County sheriff's deputy watched.

17.    The next incident occurred in 2015, when Steve Bazillo, a black man with whom Mr. Brown was slightly acquainted, brought in his Lincoln Town Car, complaining about a noise in the rear end:

a.    Although Mr. Brown diagnosed what was wrong with the car, he told Mr. Elder that he did not want to work on any black customers' cars,  because if there were any complaints about the quality of the work or any request for a refund, Mr. Brown would be accused of colluding with the black customer.

b.    Mr. Elder nonetheless ordered Mr. Brown to do the work, which Mr. Brown did, with no problems, and Mr. Elder signed off on it.

c.    A white mechanic, John Post, came by, observed the car on the lift and told the service manager, Brian Brown, that the car was leaking coolant.  The service manager informed Mr. Elder, who assigned Mr. Post to repair the coolant leak.

d.    Mr. Bazillo returned the following day, complaining of an oil leak, which had been caused by Mr. Post's having cracked an oil seal when stopping what he had said was a coolant leak.

e.    Mr. Elder wanted Bazillo to pay to repair the oil leak; Mr. Bazillo refused to pay and, instead, telephoned corporate headquarters, which reviewed the paperwork and determined that Mr. Post was at fault.

f.    Mr. Bazillo was then sent to the Tires Plus store in Gatland, the manager of which telephoned Mr. Brown to accuse him of sending a black "buddy" in to cheat Tires Plus, even though Mr. Bazillo had not asked

for a refund and had offered to pay for the parts to fix the oil leak that Mr. Post had caused.

g.    Mr. Brown went to complain to Mr. Elder, who responded by telling him, "Y'all always stick together when your getting something over on someone," told Mr. Brown that he had already e-mailed the district manager, Mr. Perry, and instructed Mr. Brown to either "go back to work, or go home, and I don't give a damn which one."

h.    When Mr. Brown reiterated that this was precisely why he had not wanted to work on Mr. Bazillo's car, Mr. Elder told him, "Clock the hell out and go home," which was short circuited by the serendipitous appearance of a customer asking for Mr. Brown to check out his car.

i.    Mr. Perry visited the Port St. Lucie store a few days later, accused Mr. Brown of costing Tires Plus money and threatened to fire him — even though the oil leak had been documented as being the fault of Mr. Post.

18.    In or about October or November 2015, a woman on a bicycle approached Mr. Brown at the store, asking if he were a mechanic and, if so, could she hire him to put a new set of brakes on a Ford F250 pick-up truck in which she and her boyfriend had driven to Port St. Lucie from Tampa:

a.    Doing side work, which would take a customer away from Tires Plus, is a terminable offense;

b.    Mr. Brown, who had never met the woman before, said that he did not do any work outside of Tires Plus, but

      c.     She nonetheless continued to press him to agree to do the work and take the money — which he continued to refuse.

      d.     After she rode off, Mr. Brown was road-testing a car on which he had finished working, drove around the next corner from the store, and saw the woman putting her bike into Mr. Perry's truck as Mr. Perry sat in the driver's seat.

19.    Mr. Brown in or about November or December 2015 told both Mr. Perry and Candace Ledecki, the manager of the Port St. Lucie store from February 2015 forward, that he wished to become a Tires Plus manager and wished to be transferred to an inside sales jobs at the Port St. Lucie store:

      a.     Ms. Ledecki said that she thought Mr. Brown would do well as an inside salesman and taught him how to write up a tire-sales ticket.

      b.     She also told him that she did not understand what Mr. Perry had against him.

20.    Mr. Perry, who was in charge of scheduling ASE certification renewal tests, mis-scheduled Mr. Brown to take his renewal tests for brake work, as well as suspension and steering, causing it to lapse — while making sure to correctly schedule the renewal examination for Mr. Post, another ASE certified technician in Mr. Perry's district.

21.    Mr. Perry on or about January 5, 2016, transferred Mr. Brown from the Port St. Lucie store, which was relatively close to Mr. Brown's home in Fort Pierce, to Stuart, which was a longer drive south into Martin County:

     a.    Ms. Ledecki telephoned Mr. Brown about 6:45 p.m. on Monday, January 4, to alert him that to what Mr. Perry was planning to do — even though she said she wanted to keep Mr. Brown in the Port St. Lucie store.

     b.    Mr. Brown immediately telephoned Mr. Perry, who confirmed that he was transferring Mr. Brown to Stuart because:

         i.    Mr. Brown had agreed when he was hired to work at any Tires Plus store within a 50-mile radius of his home, and

         ii.    The Stuart store "need[ed] a strong mechanic" — even though the Stuart store already had a mechanic with similar credentials to those of Mr. Brown and was not as busy as the Port St. Lucie store.

     c.    When Mr. Brown said that the immediate transfer would be a problem because Mr. Brown's truck was in the shop, Mr. Perry told him that a flatbed truck was scheduled to pick up Mr. Brown's tool box in the morning and transfer it to Stuart, and asked Mr. Brown if he were abandoning his job by refusing to accept the transfer, to which Mr. Brown responded by saying that he was not abandoning his job.

     d.    When Mr. Brown asked why he was being required to go to the Stuart store when a white mechanic from the western Port St. Lucie store had been allowed to decline a transfer to Stuart, Mr. Perry responded, "Curtis, that's got nothing to do with you."

     e.    Mr. Brown, however, was not expected to accept the transfer:

       i.     When Mr. Brown showed up in a borrowed truck at the Port St. Lucie store on the morning of Tuesday, January 5, to gather his personal possessions, other than his tool box, Ms. Ledecki expressed surprise that he had shown up;

       ii.    When he arrived at the Stuart store, none of the employees that had moved their tool boxes to make room for his, which is typically done in advance of a new mechanic's anticipated arrival.

22.    When Mr. Brown arrived at the Stuart store, he was the only black employee there, and the unwelcomeness was palpable:

     a.    While the white employees largely ignored him during the first week, other than to act as if his presence offended them, that all changed the first Saturday when Mr. Tuma, the store manager, called a store-wide meeting.

     b.    Mr. Brown sat at the back of the room, with his back against a window, flanked by Jose Bautista, a Mexican-American from Indiantown and the only other non-white employee at the store, and Michael ("Little Mike") Marinaro.

     c.    Mr. Brown noticed that Mr. Marinaro was wearing a holstered firearm on his belt, and Charles Brown, another white employee, was standing with his hand in his right pocket as if he were holding something.

     d.    After Mr. Tuma finished discussing the store's financial performance, he transitioned into discussing how there was a new employee

at the store, i.e., Mr. Brown, and that the other employees needed to work with Mr. Brown if he needed any help.

e.      The request was met with verbal refusals to do so by everyone other than Mr. Bautista.

f.      The assembled employees argued to Mr. Tuma that the store did not need another technician.

g.      Michael Butler, a technician of the same rank as Mr. Brown — and the unofficial leader of the white employees — stood and announced: "I don't have time for this bullshit and I'm leaving."  Mr. Tuma said that the meeting was not over, to which Mr. Butler said he did not care.  Within two to three minutes, all the others walked out.

h.      When Mr. Brown brought to Mr. Tuma's attention that "Little Mike" was openly wearing a handgun on his hip, and that the white Mr. Brown had appeared to have one in his pocket, Mr. Tuma's response was:  "Aw, they're just young kids.  They don't mean any harm."

i.      As Mr. Brown walked to his car in the parking lot, he noticed Messrs. Butler, Charles Brown and Marinaro talking to each other next to Mr. Butler's truck.

j.      Richard Cartwright, meanwhile, pulled in front of Mr. Brown in his Mini-Cooper and lowered the passenger-side window.  A .380-caliber pistol lay on the passengers seat, and Mr. Cartwright told Mr. Brown that he needed to "be careful down here" because all of the white employees own guns.

k.     The white Mr. Brown approached the black Mr. Brown as the black Mr. Brown walked about Mr. Cartwright's car, with the white Mr. Brown's hand still in his pocket; looked the black Mr. Brown up and down and told him, "Your kind don't last long down here."

l.     When the black Mr. Brown asked the white Mr. Brown what he meant, his response was to say, "What do you think it means," and to turn and walk away.

m.     The black Mr. Brown reported this to Mr. Tuma the next time he saw him.

n.     Mr. Tuma's response was that this was "just child's play," and that the other employees were "just trying to shake you up."

23.     The hostility continued to escalate:

a.     Within the first month of his employment at the Stuart store, a co-worker who saw the wedding picture that Mr. Brown keeps mounted on the inside of his tool box, along with a note reminding him of his anniversary date, left him a note stating:   "She's white not you."

b.     Mr. Brown took the note to Mr. Tuma, who threw it in the trash, telling Mr. Brown that "[y]ou know, the guys in there are just young."

c.     The service manager, Brian Piotraschke, rather than praising Mr. Brown for his prompt and efficient work, told Mr. Brown to "slow down" because "some of the guys in there are complaining," to which Mr. Brown responded:   "We'll talk about the slow-down stuff later; I've got a brake job to do by noon."

24.   On or about March 25, 2016, there began parallel series of disciplinary actions against Mr. Brown by management and incidents of hostility by Mr. Brown's white co-workers and managers.  It began with Mr. Piotraschke, the acting service manager, giving Mr. Brown a written warning, the first of four leading up to his May 23 termination:

a.   Mr. Piotraschke had asked Mr. Brown if he could do a front-end alignment on a car prior to the close of business March 24 so that the customer could pick it up in the morning.  Mr. Brown responded that he doubted he could because he was committed to doing several brake jobs, which actually took him until 7:15 p.m. to complete.  Mr. Piotraschke said that would be acceptable, and that he would have the work done by Mr. Marinaro, the technician originally assigned to it, when Mr. Marinaro opened the store in the morning

b.   The following morning, when Mr. Brown arrived at 8 a.m., he saw the car sitting outside and witnessed the customer arrive to get it about 10 a.m.

c.   Mr. Piotraschke called Mr. Brown to the service desk that afternoon, saying it was important that he speak to him.  When Mr. Brown arrived, he said if it were important, and did not concern Mr. Cartwright, who was standing with Mr. Piotraschke, that Mr. Cartwright should leave. Mr. Piotraschke instructed Mr. Cartwright to leave, which Mr. Cartwright obeyed, but did so mumbling under his breath.

d.     At that point, Mr. Piotraschke told Mr. Brown that he was writing Mr. Brown up for insubordination for not having done the wheel alignment, telling Mr. Brown that the customer had come to get the car at 6:30 a.m., which is before the store is open.

e.     Mr. Brown told Mr. Piotraschke that he was at the store when the customer came and picked up the car, but Mr. Piotraschke said that did not matter:  Mr. Perry had instructed him to write up Mr. Brown.

f.     Mr. Brown said that he would sign it, but wanted to speak with Mr. Tuma, because it did not seem right to Mr. Brown.

g.     At that point, Mr. Cartwright reapproached, accused Mr. Brown (who had been pointing in the general direction of Mr. Cartwright and Mr. Butler) of "badmouthing" him, and started screaming random insults as he continued to approach, cheered on by another white employee.

h.     Although Mr. Piotraschke stepped in between Mr. Brown and Mr. Cartwright, Mr. Cartwright continued to threaten to "kick [Mr. Brown's] ass" and referred to him as a "fuckin' nigger," which prompted laughter from nearby white employees.

i.     Mr. Piotraschke reported the incident to Tuma, casting Mr. Brown as the aggressor; nothing adverse happened to Mr. Cartwright.

j.     Mr. Brown overheard Mr. Piotraschke telling Mr. Cartwright a couple of days later, "I gave Curtis his first write-up."

25.     Mr. Cartwright told Dan Bonatz, a white employee who started work on or about March 31 and whom Mr. Brown was trying to help learn his

way about the store, "Don't trust those two niggers there — that Mexican nigger[, referring to Mr. Bautista,] or that little skinny nigger.  They'll stab you in the back."

26.    In April, according to the white Mr. Brown, who was angry with Mr. Cartwright about an unrelated matter, Mr. Cartwright took the black Mr. Brown's $500 handheld diagnostic scanner from his tool box and threw it into a trash can when Mr. Brown was not looking; although Mr. Cartwright initially denied ever touching the scanner, he then acknowledged that he moved the scanner from a work bench to the top of Mr. Brown's rolling tool box; Mr. Duma said that someone, maybe even himself, had probably just taken the scanner to use it — even though the store had a $10,000 scanner for all of the mechanics to use.

27.    Within this time frame, Tires Plus's corporate headquarters was put on notice of the racial dysfunction in the Stuart store, exhibited an awareness that behavior might violate federal law by sending a woman from Human Resources down to investigate it, but exhibited reckless indifference to the Stuart situation by not even interviewing Mr. Brown, notwithstanding his availability to the Human Resources investigator:

a.    The situation arose when Mr. Bautista's girlfriend drove up to the store one day and lowered the passenger-side window, through which Charles Young, a white tire changer, tossed an unused condom, with a vulgar message written on the back of the package:

b.    Mr. Bautista confronted Mr. Young, who did not respond when asked why he had done that;

c.    Mr. Brown attempted to support Mr. Bautista against the assembled white employees;

d.    Mr. Bautista, supported by Mr. Brown as his witness, then went to Mr. Tuma, who did nothing, so

e.    Mr. Bautista and his girlfriend escalated their complaint to corporate Human Resources, however, and got the attention of Human Resources.

f.    When a black woman from Human Resources visited the Stuart store in or about April in response to Mr. Bautista's complaint, Mr. Perry, the district manager:

    i.    coached Messrs. Butler, Marinaro, and Wainwright about what to say to her;

    ii.    avoided speaking to Mr. Brown prior to her arrival, but

    iii.    inserted himself between Mr. Brown and the woman from Human Resources when she approached Mr. Brown, and she permitted Mr. Perry to divert the conversation to how long Mr. Perry had known Mr. Brown and how Mr. Brown had built an El Camino from spare parts — anything to prevent Mr. Brown, the only black employee in the store, from having the opportunity to tell the woman from Human Resources what was going on.

28.     Subsequent to the visit by the woman from Human Resources, Mr. Tuma not only gave Mr. Brown a verbal warning for having attempted to intervene when the white employees were harassing Mr. Bautista and his girlfriend during the condom incident, but told Mr. Brown that he was no longer permitted to teach Mr. Bautista anything about automotive mechanics and, if Mr. Brown did so, Mr. Tuma would terminate Mr. Brown on the spot.

29.     When Mr. Brown entered the Stuart store's toilet stall one day in April, he noticed that empty toilet-paper roles with racial slurs written on them, including one with a caricature of a black man sitting on a toilet and suffering apparent constipation, captioned "Curtis too much fried chicken and watermelon," and another accusing black people of spreading ebola, had been lined up atop the handicap railing:

a.     Mr. Tuma would necessarily have seen the display because he unswervingly used the toilet stall once every morning and once again every afternoon before going home.

b.     Mr. Brown, who took photographs of the toilet paper rolls, went immediately to retrieve Mr. Tuma from his office to take him into the stall.

c.     Once there, Mr. Brown asked Mr. Tuma, "What the hell is this?," telling Mr. Tuma that someone had now "gone too far," and inquiring, since Mr. Tuma used the toilet stall every morning and every afternoon, whether Mr. Tuma had written the slurs himself — or had just seen them and laughed at Mr. Brown when he had used the toilet that morning.

d.      As Mr. Brown exited with bathroom with the toilet rolls in his hand, two white employees, Messrs. Cartwright and Young, were laughing.

e.      When Mr. Brown followed Mr. Tuma into his office and asked him what he was going to do about it, Mr. Tuma responded, "Nothing," following up with "Do you want me to fire everybody" and adding, "I just don't think you fit in with my guys in my shop, that's all."

30.    In  May, Mr. Cartwright, the tire changer who had earlier threatened to "kick [Mr. Brown's] ass" and called him a "fuckin' nigger," yelled at Mr. Brown, "[w]hy are you staring at me," even though Mr. Brown was not staring at him, and threw Mr. Brown's wheel hammer into the parking lot.

31.    When Mr. Brown complained to Mr. Tuma about the incident, Mr. Tuma said that the white employees were acting childishly, and that he was going to schedule a meeting to discuss their behavior — but never did.

32.    Management in that month stepped up its assault on Mr. Brown, with the first incident being a false accusation that Mr. Brown had damaged a car on which he had been assigned to work:

a.      On May 2, Karla Preissman, a customer who was leaving town for two weeks, dropped off a fairly new Lexus for a tune-up and a fuel-induction system cleaning.

   b. Her leaving town meant that she would not pay her bill right away, and that the mechanic doing the work on the car, i.e., Mr. Brown, would not be paid until she did.

   c. After the work was finished, both Mr. Brown and Mr. Tuma took the for an elongated series of test drives because neither of them initially recalled that the new model Lexus required pushing a reset button below the dash to turn off the warning light.

   d. After the problem was realized and corrected, Mr. Tuma dropped Mr. Brown off and parked the car, which was undamaged, in a lot where customers' cars are kept to await pickup.

   e. When the customer came to collect the car two weeks later, the outside rear-view mirror was damaged and two of the car's oil solenoids were damaged.

   f. Mr. Tuma — who had not mentioned any problem when he and Mr. Brown took the Lexus for the three to four test drives — accused Mr. Brown May 16, both verbally and in a written warning, of having:

     i. broken the outside rear-view mirror;

     ii. failed to address a valve train noise, which Mr. Brown did not observe to exist, but to correct which issue Mr. Tuma had personally changed the oil and oil filter, adding an oil stabilizer that was not amongst the brands routinely carried by Tires Plus, which was against Tires Plus policy — against which Mr. Brown cautioned Mr. Tuma;

iii.    left "grease all over the foot well," even though Mr. Brown had put paper on the floor and had not gotten any grease on the carpet;

iv.    gotten "yellow pain on the fender," although there was no such damage when Messrs. Brown and Tuma test-drove it, which was the last time Mr. Brown touched the car;

v.    "failed to reset the maintenance warnings," which is what Messrs. Brown and Tuma had done during the three to four test drives that they took prior to recognizing the reset-button issue;

vi.    damaged the car's oil solenoids, which could only have been done by Mr. Tuma himself, since Mr. Brown did nothing whatsoever with the car's oil, and

vii.    left excess induction fluid in the intake, which fluid would have been dissipated during the three to four test drives on which Mr. Brown and Mr. Tuma had taken the car.

g.    Notwithstanding that Mr. Brown had no responsibility for anything that might have been wrong with the Lexus when Ms. Preissman came to pick it up, Mr. Tuma withheld Mr. Brown's commission on the job to pay Mr. Butler to repair the oil solenoids that Mr. Tuma had damaged and the mirror, and to pay a day's car-rental for the customer.

h.    Although Mr. Tuma dated the written warning May 16, he did not give it to Mr. Brown until a Saturday, May 21, meeting, at which time

he also gave him a May 16 "final"  written warning  that Mr. Tuma said he
had been instructed to issue by Mr. Perry.

       i.     The second May 16-dated written warning, involving Work
Order No. 116891, accused Mr. Brown of having "[done] a brake inspection
and failed to pump up the pedal prior to backing the vehicle out," which
"resulted in a crash with bushes that damaged the vehicle."

       j.     There actually was no damage to either the van or any
Tires Plus property because of the incident involving a vehicle that Mr.
Brown:

           i.     had described in writing as "unsafe to drive,"

           ii.      had recommended not be backed out of the garage,
but

           iii.     was ordered by Mr. Tuma nonetheless to back it out.

       k.     Mr. Tuma docked Mr. Brown $700 in commissions because
of the incident.

       l.     Mr. Tuma's assertion that Mr. Brown had backed the van
out of the garage without pumping the brakes ignores both:

           i.     the fact that Mr. Brown told him that he had pumped
the brakes, and

           ii.     the reality that the van involved would not allow a
driver to put it in reverse without stepping on the brakes.

    33.    Mr. Brown's final day working for Tires Plus, Monday, May 23,
began with Mr. Marinaro starting an argument by falsely accusing Mr. Brown

of breaking a clogged positive crankcase ventilator on a Ford Taurus.  A new
service manager named Ron intervened and ended the argument, but said
to Mr. Brown:  "Why does this store hate you?  I'm giving you one more
chance.  I'm going to let you go back to work and see how it works towards
the end of the day."

34.    The next thing that occurred is that Mr. Brown wrote up his
diagnosis of what needed to be done on a Nissan that had previously been
worked on by Mr. Butler and needed a tuneup, required the installation of a
valve cover gasket and needed repair of its lower motor mount:

a.    Mr. Brown, who was not allowed to do his own diagnoses
of what needed to be done and to get the customer's approval to proceed,
although Mr. Butler was, gave the write-up to Mr. Tuma;

b.    Mr. Tuma told Mr. Brown to work on another car, for which
a customer was in waiting in the store for it to be repaired,  and took a hour
to issue a work order on the Nissan, which had been towed in.

c.    When Mr. Tuma finally issued the work order, he told Mr.
Brown that he would have to do the job for no commission, since the
customer had been waiting for an hour — to which Mr. Brown objected,
because:

i.    the delay was Mr. Tuma's fault and not his, and

ii.    no customer was waiting since the car had been
towed in.

        d.     Mr. Brown, however, did not say that he would not do the job.

35.     Shortly thereafter, Mr. Tuma told Mr. Brown that he had called corporate headquarters, told whomever he spoke to there that Mr. Brown was refusing to do a job that was assigned to him, and that, "I like you man, but corporate said I got to let you go."

36.     At that point, Mr. Brown asked Mr. Tuma why had he requested that Mr. Brown be transferred to his store, which is what Mr. Perry had told Mr. Brown in January, if Mr. Tuma did not want him there?

37.     Mr. Tuma responded:  "I didn't ask for you.  Dave Perry sent you because he figured you wouldn't show up because of the reputation of the shop.   He felt that you'd quit and we wouldn't have to fire you.  Curtis, just make it easy on you and me and just quit because this is as easy as it's going to get.  Butler and those guys are all young minded."

38.     While Mr. Brown had exercised sufficient self-control to not allow himself to get into confrontations at work, the situation in Stuart had so upset him that he separated from his wife for approximately six weeks in April and May because of the anger that he was bringing home every night.

39.     Mr. Brown had anticipated that the likelihood of his getting fired from Tires Plus was an issue of "when" rather than an "if," but when it actually happened it upset him so much that, rather than immediately tell his wife about it, he spent the next three nights sleeping in his truck.

40.    The actions of Tires Plus, through Mr. Perry and Mr. Duma, constituted an interference with Mr. Brown's right to make and enforce contracts based on his race, as that phrase is defined by 42 U.S.C. § 1981(b).

41.    As a direct, natural and proximate result of Tires Plus, Mr. Perry and Mr. Duma's actions towards Mr. Brown, Mr. Brown has suffered damages, including but not limited to:

      a.    lost earnings;

      b.    diminishment of earning capacity; and

      c.    emotional distress and mental anguish.

42.    Tires Plus, Mr. Perry and Mr. Duma's wilful or recklessly indifferent disregard of Mr. Brown's federally protected rights against discrimination in the making and enforcement of contracts was such as to entitle Mr. Brown to punitive damages against Tires Plus and against Messrs. Perry and Duma in their individual capacities, to punish Tires Plus, Mr. Perry and Mr. Duma, and to deter them and others like them from such conduct in the future.

43.    If not enjoined by this Court, Tires Plus, Mr. Perry and Mr. Duma's would continue to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce his contract of employment with Tires Plus.

44.     Plaintiff is entitled, pursuant to 42 U.S.C. § 1988, to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Curtis Brown, prays that this Court will grant judgment for him, and against Defendants, Tires Plus, as well as against Messrs. Perry and Duma in their individual capacities:

*One*, determining that Tires Plus, Mr. Perry and Mr. Duma have interfered, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts, as that right pertains to his employment by Tires Plus;

*Two*, enjoining Tires Plus, and Messrs. Perry and Duma, both in their individual and corporate capacities, and anyone working in concert with any of them, both preliminarily and permanently, from continuing to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts, including through reinstatement, or if reinstatement were not reasonable as a make-whole remedy, through an award of front pay;

*Three*, awarding damages against Tires Plus, Mr. Perry and Mr. Duma, jointly and severally, for lost wages, lost earning capacity, other financial damages and emotional distress, and individually against each defendant for punitive damages;

*Four*, awarding costs, including attorney's fees and litigation expenses, against Tires Plus, Mr. Perry and Mr. Duma, jointly and severally; and

*Five*, granting such other and further relief as is just.

## Count II:  Claim Under 42 U.S.C. § 1981 for
## Hostile Environment Race Discrimination

45.     Plaintiff, Curtis Brown, realleges and adopts, as if fully set forth in Count II, the allegations of ¶¶ 1-34 and 37-39.

46.     The behavior outlined in ¶¶ 15-33 and 37-38 were sufficiently serious or pervasive as to alter the terms and conditions of Mr. Brown's conditions of employment and create an abusive working environment.

47.     By engaging in the behavior alleged in ¶¶  15(a)-(c) and (f), 16(a)-(c), 17(f)-(i), 18(a)-(d), 20, 21(b)-(e), 22(n), 23(c), 24(a)-(f) and (i)-(j), 27(d) and (f), 28, 29 (e), 31, 32(a)-(i) and 37, and permitting others to engage in the behavior alleged in ¶¶ 15(a) and (d), 22(a)-(m), 23(a)-(b), 24(g)-(h), 25, 26, 27(a)-(d), 29(a)-(d), 30, Tires Plus and Messrs. Perry and Tuma interfered, and permitted their subordinates to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts, as that phrase is defined by 42 U.S.C. § 1981(b), by subjecting him, and permitting others to subject him, to a racially hostile environment.

48.     As a direct, natural and proximate result of Tires Plus, Mr. Perry and Mr. Duma's actions towards Mr. Brown, Mr. Brown has suffered damages, including but not limited to:

          a.     emotional distress and mental anguish;

          b.     lost commissions that were wrongfully docked;

          c.     additional travel time and expense to commute to Stuart,

      d.    the cost of his rent for the period that he was separated from his wife because of anger issues caused by the harassment, and

      e.    the replacement cost of his stolen scanner.

49.    Tires Plus, Mr. Perry and Mr. Duma's wilful or recklessly indifferent disregard of Mr. Brown's federally protected rights against discrimination in the making and enforcement of contracts was such as to entitle Mr. Brown to punitive damages against Tires Plus and against Messrs. Perry and Duma in their individual capacities, to punish Tires Plus, Mr. Perry and Mr. Duma, and to deter them  and others like them from such conduct in the future.

50.    If not enjoined by this Court, Tires Plus, Mr. Perry and Mr. Duma would continue to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts by subjecting him, and permitting others to subject him, to a racially hostile environment.

51.    Plaintiff is entitled, pursuant to 42 U.S.C. § 1988, to recover his costs and litigations expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Curtis Brown, prays that this Court will grant judgment for him, and against Defendants, Tires Plus, Mr. Perry and Mr. Duma:

***One***, determining Tires Plus, Mr. Perry and Mr. Duma interfered, based on Mr. Brown's race, beginning in 2014 and continuing through May 23, 2016, with Mr. Brown's right to make and enforce contracts by subjecting

him to a racially hostile environment, and knowingly encouraging or allowing others to do so;

*Two*, enjoining Tires Plus, Mr. Perry and Mr. Duma from continuing to interfere, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts by subjecting him to a racially hostile environment, or knowingly encouraging or allowing others to do so;

*Three*, awarding damages against Tires Plus, Mr. Perry and Mr. Duma's, jointly and severally, and individually against each defendant for punitive damages;

*Four*, awarding costs, including attorney's fees and litigation expenses, against Tires Plus, Mr. Perry and Mr. Duma, jointly and severally; and

*Five*, granting such other and further relief as is just.

### Count III:  Claim Under 42 U.S.C. § 1981 for Retaliation

52.    Plaintiff, Curtis Brown, realleges and adopts, as if fully set forth in Count III, the allegations of ¶¶ 1-10, 15, 17, 20, 21, 22, 23(a)-(b), 24(a)-(f) and (j) and 26-37.

53.    Mr. Brown's complained to management, i.e., to Messrs. Elder, Perry and Tuma, consistent with Tire Plus's policy about following the chain of command, about having his federally protected rights to make and enforce contracts, as defined by 42 U.S.C. § 1981(b), interfered with because of his race, as more particularly alleged in ¶¶ 15(c) and (f), 17(g)

and (h), 21(d), 22(m), 23(b), 24(e) and (f), 26, 27(d), 29, 30, 31, 34(c) and 36.

54.     Mr. Brown would specify when he complained about the various matters that he was doing so because he felt the actions against him were racially motivated; his managers would respond by accusing him of "playing the race card."

55.     Subsequent to, and because of those complaints, Tires Plus, through Messrs. Perry and Tuma, took a series of adverse actions against him, which adverse actions would be sufficient to cause an ordinarily reasonable employee not to complain about interference with  his rights to make and enforce contracts, as defined by 42 U.S.C. § 1981(b), as more particularly alleged in ¶¶ 17(g)-(i), 18, 20, 21, 24(e), 28, 32(g) and (k), 35 and 37.

56.     If not enjoined by this Court, Tires Plus, Mr. Perry and Mr. Duma would continue to retaliate against Mr. Brown, based on my Brown's having complained about their interference, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts by subjecting him to tangible job detriments and subjecting him, and permitting others to subject him, to a racially hostile environment.

57.     Plaintiff is entitled, pursuant to 42 U.S.C. § 1988, to recover his costs and litigations expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Curtis Brown, prays that this Court will grant judgment for him, and against Defendants, Tires Plus, Mr. Perry and Mr. Duma:

*One*, determining that Tires Plus, Mr. Perry and Mr. Duma retaliated against Mr. Brown, based on Mr. Brown's having complained about their interference, based on Mr. Brown's race, with Mr. Brown's right to make and enforce contracts by subjecting him to tangible job detriments and subjecting him, and permitting others to subject him, to a racially hostile environment;

*Two*, enjoining Tires Plus, and Messrs. Perry and Duma, both in their individual and corporate capacities, and anyone working in concert with Mr. any of them, both preliminarily and permanently, from continuing to retaliate against Mr. Brown

*Three*, enjoin Tires Plus to make Mr. Brown whole, including through reinstatement, or if reinstatement were not reasonable as a make-whole remedy, through an award of front pay;

*Four*, awarding damages against Tires Plus, Mr. Perry and Mr. Duma, jointly and severally, for lost wages, lost earning capacity and emotional distress, and individually against each defendant for punitive damages;

*Five*, awarding costs, including attorney's fees and litigation expenses, against Tires Plus, Mr. Perry and Mr. Duma, jointly and severally; and

*Six*, granting such other and further relief as is just.

**Demand for Jury Trial**

Plaintiff demands jury trial by jury on all issues so triable.

Respectfully Submitted,

/s/    *William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

**Attorneys for the Plaintiff,**
      **Curtis Brown**